**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA

vs.                                                               Case No.  3:10-cr-67-J-34JRK

DANIEL E. HAMPTON
          a/k/a Daniel Edmund Hampton
_____/

## REPORT AND RECOMMENDATION[1]

This cause is before the Court on Defendant's Motion to Suppress (Doc. No. 42;
"Motion"), filed April 14, 2010.  The Motion is opposed.  <u>See</u> United States' Response to
Defendant's Motion to Suppress (Doc. No. 65; "Response"), filed June 14, 2010.  In the
Motion, Defendant Daniel E. Hampton ("Defendant") seeks to suppress "any and all evidence
seized and/or obtained from the Defendant, as a result of the search of his vehicle[.]" Motion
at 1.  The undersigned concludes Defendant's arguments in support of his Motion are
without merit and recommends that the Motion be denied.

### I.  Background

On March 2, 2010, Defendant was arrested by the St. Johns County Sheriff's Office
for various drug crimes, crimes involving the possession of firearms and stolen goods, and
resisting an officer without violence.  Although Defendant was arrested by the St. Johns
County Sheriff's Office, a Drug Enforcement Administration agent arrived at the scene of

---

[1]        Within fourteen (14) days after service of this document, specific, written objections may be
filed in accordance with 28 U.S.C. § 636, Rule 59, Federal Rules of Criminal Procedure, and Rule 6.02(a), Local
Rules, United States District Court, Middle District of Florida.  Failure to file a timely objection waives a party's
right to review.  Fed. R. Crim. P. 59.

Defendant's arrest and, after consulting with an Assistant United States Attorney, decided federal prosecution was warranted.  That same date, a Complaint (Doc. No. 1) was filed in Case No. 3:10-mj-1057-MCR.[2]  The Complaint alleged that, in connection with the incident resulting in Defendant's arrest by the St. Johns County Sheriff's Office, Defendant possessed with intent to distribute fifty grams or more of a mixture or substance containing a detectable amount of cocaine base, specifically approximately 124 grams of cocaine base, and Defendant possessed a firearm in furtherance of a drug crime, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A), and 18 U.S.C. § 924(c).  Defendant was brought before the Honorable Monte C. Richardson, United States Magistrate Judge, for an initial appearance. See Minute Entry (Doc. No. 2).

On March 10, 2010, a federal grand jury returned a three-count indictment charging Defendant with knowingly possessing with intent to distribute cocaine base, the amount of cocaine base being fifty grams or more, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A); knowingly possessing a firearm in furtherance of a drug crime, in violation of 18 U.S.C. § 924(c)(1)(A); and knowingly possessing in, and affecting commerce, a firearm after having previously been convicted of a crime punishable by a term of imprisonment exceeding one year, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a).  Indictment (Doc. No. 13) at 1-2.  With the return of the indictment, the instant case was opened and the indictment became the operative charging document.  Defendant was arraigned on March 12, 2010 and entered a plea of not guilty.  See Minute Entry (Doc. No. 20).

---

[2]     All citations to the record are to the instant case, 3:10-cr-67-J-34JRK, unless otherwise noted.

Thereafter, on April 14, 2010, the Motion was filed.  An evidentiary hearing was held on April 23, 2010.  See Minute Entry (Doc. No. 48); Transcript (Doc. No. 60; "Tr. from 4/23/10").  The evidentiary hearing was continued to and concluded on May 5, 2010.  See Minute Entry (Doc. No. 52); Transcript (Doc. No. 58; "Tr. from 5/5/10").  Following the evidentiary hearing, the parties submitted supplemental memoranda for the Court's consideration.  See Supplemental Memorandum of Law in Support of Defendant's Motion to Suppress (Doc. No. 64; "Defendant's Supplement"); Response.

## II.  Summary of Evidence[3]

### A.  Pre-Arrest Incident and Arrest

On March 2, 2010, around 7:00 or 8:00 a.m., North Carolinians David Calvin Johnston and Neil Stanley Jones were eating breakfast in the lobby of a Quality Inn on State Road 16 in St. Augustine, Florida.[4]  Tr. from 4/23/10 at 21-22, 28, 83-84.  The two were staying at the hotel in St. Augustine because they were attending bike week in Daytona Beach, Florida.  Tr. from 4/23/10 at 21, 29, 33, 83-84.  As Mr. Johnston and Mr. Jones were eating, Mr. Johnston "overheard a person come in and tell the desk clerk that there was a vehicle in the

---

[3]     The Government called four witnesses: David Calvin Johnston, Neil Stanley Jones, Deputy Thomas Troy Bickhart of the St. Johns County Sheriff's Office, and Corporal Greg Mullenix of the St. Johns County Sheriff's Office.  In addition, the Government offered multiple exhibits.  See Gov's. Exh. Nos. 1-6.  Defendant called no witnesses but offered multiple exhibits.  See Def's. Exh. Nos. 1-10.  There are a number of factual inconsistencies amongst the witnesses' testimony and/or the exhibits presented.  Most factual inconsistencies are not material.  Where material, the inconsistencies are resolved with the undersigned's factual findings.

[4]     As it turns out, Mr. Johnston is employed as a correctional officer with the North Carolina Department of Corrections.  Tr. from 4/23/10 at 22, 30, 38-39.  Mr. Jones formerly "worked in a maximum security prison for 30 years[.]"  Tr. from 4/23/10 at 95.  Both men were dressed in t-shirts and shorts on the day in question.  Tr. from 4/23/10 at 28, 74, 85.  Neither of them was acting in their respective capacities as a correctional officer and a former correctional officer, Tr. from 4/23/10 at 28, so they are not referred to by their professional titles.

parking lot on fire."  Tr. from 4/23/10 at 22, 45-46, 84.  Knowing their motorcycles were parked in the parking lot, the men ran outside to see what was happening and to see whether the vehicle on fire was near their motorcycles.  Tr. from 4/23/10 at 22, 46, 47-48, 104.  Once outside, Mr. Johnston and Mr. Jones saw a black Dodge Magnum ("the Vehicle") backed into a parking space in the parking lot.[5]  Tr. from 4/23/10 at 60-61, 85, 102, 110.  The Vehicle was parked in a space at the edge of the parking lot; a curb and a retention pond were directly behind the Vehicle.  Tr. from 4/23/10 at 101-02.

Mr. Johnston described the Vehicle as "fully engulfed in smoke[.]"  Tr. from 4/23/10 at 22-23, 29, 49.  Mr. Jones thought the smoke was coming from "underneath the hood, the grill and even as far as up under the fender wells."  Tr. from 4/23/10 at 85.  The Vehicle appeared to both men to be on fire.[6]  Tr. from 4/23/10 at 23, 85.  In addition, the men heard the Vehicle's "engine . . . racing wide open[.]"  Tr. from 4/23/10 at 22, 29, 50, 85.  Mr. Jones thought the accelerator must have been pushed down because "the engine was screaming."[7]  Tr. from 4/23/10 at 85.

Concerned that someone might be inside the Vehicle, Mr. Johnston and Mr. Jones approached it.  Tr. from 4/23/10 at 23, 73.  Because the Vehicle had dark tinted windows and was filled with smoke, neither Mr. Johnston nor Mr. Jones could see inside it.  Tr. from

---

[5]    Mr. Johnston recalled at the hearing having seen the Vehicle in the parking lot on his way to the lobby for breakfast that morning, at which time nothing seemed out of the ordinary.  Tr. from 4/23/10 at 35-36, 41, 42.  Mr. Jones did not recall seeing the Vehicle on his way to the lobby.  Tr. from 4/23/10 at 103.

[6]    The men later learned the Vehicle was not actually on fire at the time they saw it; rather, the engine was overheating.  Tr. from 4/23/10 at 121, 125; Tr. from 5/5/10 at 51.

[7]    During breakfast, Mr. Johnston and Mr. Jones "heard noise [they] thought was construction noise or like the car wash or something that was over across the street," but they later surmised the noise must have been coming from the Vehicle.  Tr. from 4/23/10 at 42, 86, 103, 108.

4/23/10 at 23, 86, 110.  Mr. Johnston "approached the rear door on the driver's side," opened the rear driver's side door of the Vehicle, "and looked down and saw a black male sitting in the seat of the driver's side."  Tr. from 4/23/10 at 23, 43, 51-52, 86, 88-89.  The individual in the driver's seat, later identified as Defendant, was "not alert."  Tr. from 4/23/10 at 23.  Defendant's seat was in a reclined position, so Mr. Johnston "could see the top of his head prominently[,] and [he] could see [Defendant's] facial features[.]"  Tr. from 4/23/10 at 52-53.  Despite Mr. Johnston telling Defendant "the car [is on] fire, you need to get out, you need to get out, you need to get out," Defendant had "no physical reaction at all."  Tr. from 4/23/10 at 23, 24, 53, 86.

Seeing that Mr. Johnston was speaking to someone inside the Vehicle, Mr. Jones opened the driver's side front door but was met with resistence from Defendant.  Tr. from 4/23/10 at 24, 26, 43, 54, 55, 86-87, 89, 113, 114.  As the door finally opened, Mr. Johnston and Mr. Jones were able to see Defendant in the reclined position.  Tr. from 4/23/10 at 87, 113.  Defendant "looked extremely confused, extremely dazed[.]" Tr. from 4/23/10 at 25, 55, 115.  According to Mr. Jones, at that point, Defendant attempted to "reach[] over to the console area" with his right hand.  Tr. from 4/23/10 at 88, 89, 116.  Mr. Jones became concerned for his safety, thinking Defendant might have been reaching for a weapon of some sort.  Tr. from 4/23/10 at 89-90, 117.  Mr. Jones immediately attempted to grab Defendant's left arm.  Tr. from 4/23/10 at 118.  Mr. Johnston similarly grabbed Defendant's "[u]pper left arm bicep area." Tr. from 4/23/10 at 57.  The two men together attempted to pull Defendant out of the Vehicle, but Defendant continued to resist them.  Tr. from 4/23/10 at 24, 57, 90, 117.  Defendant "started fighting" to stay in the Vehicle, and "he became

-5-

excessively combative." Tr. from 4/23/10 at 24, 25, 57, 92. Mr. Jones indicated Defendant grabbed anything he could inside the Vehicle to prevent the men from removing him. Tr. from 4/23/10 at 92. Mr. Johnston and Mr. Jones thought Defendant might have been attempting to harm himself or to commit suicide because he insisted on remaining inside the Vehicle despite being told that it was on fire. Tr. from 4/23/10 at 24, 87.

Once the men were able to get Defendant out of the Vehicle "to a semi-standing position[,] he started swinging elbows and things like that." Tr. from 4/23/10 at 25, 58. Defendant "didn't say anything. He just fought." Tr. from 4/23/10 at 59. It became apparent to the men Defendant was attempting to get back into the Vehicle. Tr. from 4/23/10 at 25, 58, 119. Mr. Johnston and Mr. Jones thought Defendant's reaction was "the exact opposite reaction of what a normal person would do." Tr. from 4/23/10 at 58, 121. Mr. Johnston became concerned with his own well being and with Defendant's well being; he decided not to let Defendant get back into the Vehicle. Tr. from 4/23/10 at 25, 58-59, 73-74, 78. The struggle continued. Tr. from 4/23/10 at 58-59, 78.

At some point during the altercation between Defendant and the men, Deputy Thomas Troy Bickhart arrived. Tr. from 4/23/10 at 25-26, 91. Deputy Bickhart had been notified by his dispatcher that there was a vehicle on fire at 2310 State Road 16, which is the address of the Quality Inn. Tr. from 5/5/10 at 11, 29. Being about two miles away from the dispatch location, Deputy Bickhart proceeded to the hotel and arrived within two to three minutes of hearing the dispatcher notify him of the fire. Tr. from 5/5/10 at 12, 29.

As Deputy Bickhart arrived, he saw the Vehicle "engulfed in smoke," and he thought it was on fire. Tr. from 5/5/10 at 12, 29, 30, 36. He also saw "two males trying to get a

person out of the [V]ehicle."  Tr. from 5/5/10 at 12, 31.  The person in the Vehicle was

African-American; the two men trying to get him out were Caucasian.  Tr. from 5/5/10 at 34.

All three individuals were "tangled up. . . grabbing onto each other."  Tr. from 5/5/10 at 33-

34.  Because "there was a physical altercation that was taking place," Deputy Bickhart called

for a backup deputy.  Tr. from 5/5/10 at 18.

Deputy Bickhart pulled his patrol car "in at an angle," off to the edge of the passenger

front side of the Vehicle.[8]  Tr. from 4/23/10 at 61, 91, 122; Tr. from 5/5/10 at 37.  Deputy

Bickhart got out of his patrol car and announced "several times [he was] a law enforcement

officer."  Tr. from 5/5/10 at 15, 39, 41.  Despite Deputy Bickhart's arrival, Defendant

"continued to remain combative."  Tr. from 4/23/10 at 26.  Deputy Bickhart described what

he saw as "battery occurring in [his] presence, a misdemeanor."  Tr. from 5/5/10 at 18, 38,

53, 67-68.  Deputy Bickhart heard one of the men involved in the altercation identify himself

as a retired correctional officer and say, "[T]here's possibly a gun in the car."[9]  Tr. from

5/5/10 at 19, 40, 41, 42.  After the man identified himself, Deputy Bickhart observed

"[Defendant] still was physically fighting."  Tr. from 5/5/10 at 19.  Based on what he saw,

Deputy Bickhart determined Defendant was the aggressor.  Tr. from 5/5/10 at 20, 39, 54.

Deputy Bickhart assisted Mr. Johnston and Mr. Jones with trying to subdue

Defendant.  Tr. from 4/23/10 at 64.  Mr. Johnston described Defendant as "actively

---

[8]       Mr. Johnston thought the Vehicle could have been driven out of the parking spot despite the
way Deputy Bickhart parked in relation to the Vehicle.  Tr. from 4/23/10 at 62.  Mr. Jones thought the Vehicle
only could have been driven away after some maneuvering.  Tr. from 4/23/10 at 123-24.  Deputy Bickhart first
testified he thought Defendant could not have moved his Vehicle forward without hitting the patrol car, but then
he testified "he could still get out if you turn the wheel to the left[.]"  Tr. from 5/5/10 at 38.

[9]       According to Mr. Johnston, he did not identify himself to Deputy Bickhart as a law enforcement
officer, and he did not say anything to Deputy Bickhart until the incident was over.  Tr. from 4/23/10 at 63-64.

attacking" Deputy Bickhart, by "resisting[,] . . . throwing elbows, . . . [and] shoving around," Tr. from 4/23/10 at 75, and Mr. Jones and Deputy Bickhart confirmed Defendant was throwing elbows.  Tr. from 4/23/10 at 122; Tr. from 5/5/10 at 15, 101.  Mr. Jones testified, "[T]here's elbows, there's grabbing, you know, it's like a grappling contest, nobody hitting, beating, striking, anything like that, but we're trying to subdue this guy."  Tr. from 4/23/10 at 92.  Deputy Bickhart indicated Defendant's demeanor was "very violent."  Tr. from 5/5/10 at 19.

During the altercation, when everyone was between three and five feet away from the Vehicle, Deputy Bickhart and the two men tripped over a trailer parked near the Vehicle.  Tr. from 5/5/10 at 43-44.  As a result, Defendant broke away from Deputy Bickhart and the two men.  Tr. from 5/5/10 at 43-44.  Defendant made his way back to the Vehicle, and he sat down in the driver's seat.  Tr. from 5/5/10 at 43-44.  His body was positioned forward, but he was looking at Deputy Bickhart and the men, who were all standing just outside the driver's side door.  Tr. from 5/5/10 at 43-44.  Deputy Bickhart saw Defendant "start[] reaching underneath the [driver's] seat."  Tr. from 5/5/10 at 16, 45, 103.  Deputy Bickhart did not know what was underneath the seat, so he unholstered his taser, told Defendant to show his hands, and threatened to tase Defendant if Defendant did not exit the Vehicle.[10]  Tr. from 4/23/10 at 26, 44, 65-66, 74, 93; Tr. from 5/5/10 at 16, 47.  Deputy Bickhart looked inside the Vehicle through the open door and saw what he believed to be  "a butt of a rifle" under the passenger's seat.  Tr. from 5/5/10 at 16, 45, 69-70, 102.  Mr. Johnston saw that the taser had been deployed, and he told Mr. Jones to step back.  Tr. from 4/23/10 at 66.  In response

---

[10]     Defendant was never actually tased.  Tr. from 4/23/10 at 44.

to Deputy Bickhart's threat, Defendant showed his hands and "started to come out of the [Vehicle] but was extremely hesitant to continue to come out of the [Vehicle]."  Tr. from 4/23/10 at 27; Tr. from 5/5/10 at 17, 47, 48.

Eventually, Defendant was ordered to the ground by Deputy Bickhart.  Tr. from 4/23/10 at 67.  Because he was still reluctant to follow the deputy's commands, Mr. Johnston and Deputy Bickhart "assisted" Defendant to the ground.  Tr. from 4/23/10 at 28, 67, 93; Tr. from 5/5/10 at 48-49.  After he was face down on the ground, Defendant was placed in handcuffs.[11]  Tr. from 4/23/10 at 28, 67; Tr. from 5/5/10 at 18, 50.  At that moment, Deputy Bickhart had one knee on the ground, glanced inside the Vehicle through the open door, and saw "a butt of a handgun" under the driver's seat.  Tr. from 5/5/10 at 20, 69-70; see also Gov's. Exh. No. 1C (photograph of butt of handgun underneath driver's seat).  Deputy Bickhart also "smelled a faint odor what possibly could have been marijuana or cannabis of some sort, narcotics."[12]  Tr. from 5/5/10 at 20.  Deputy Bickhart was not sure whether the possible marijuana smell was burnt marijuana or raw marijuana.[13]  Tr. from 5/5/10 at 108.

---

[11]     Mr. Johnston testified Deputy Bickhart handed the handcuffs to Mr. Johnston, who placed the handcuffs on Defendant; Deputy Bickhart testified he himself placed the handcuffs on Defendant.  Tr. from 4/23/10 at 44-45, 70; Tr. from 5/5/10 at 18, 20, 22, 50.

[12]     Deputy Bickhart's testimony with respect to what he smelled was somewhat equivocal.  Deputy Bickhart first testified he "smelled a faint odor what possibly could have been marijuana. . . ." Tr. from 5/5/10 at 20 (emphasis added).  Later, Deputy Bickhart testified he "smelled the faint odor of marijuana."  Tr. from 5/5/10 at 68.  Then, Deputy Bickhart confirmed he smelled marijuana.  Tr. from 5/5/10 at 70.  Finally, Deputy Bickhart testified he "knew it was marijuana. . . but it just wasn't that strong at all."  Tr. from 5/5/10 at 111.  Deputy Bickhart did not include any mention of smelling marijuana in the narrative of the offense report he authored.  Tr. from 5/5/10 at 27, 73; Def's. Exh. No. 7 at 7-8.  As explained herein, whether Deputy Bickhart in fact smelled marijuana is immaterial to the undersigned's ultimate analysis.  Therefore, it is unnecessary to resolve the ambiguities in Deputy Bickhart's testimony with respect to smelling marijuana.

[13]     As part of his training to become a law enforcement officer, Deputy Bickhart attended an academy, where he was trained in "the basic smell and odor of cannabis." Tr. from 5/5/10 at 109.  In addition, as part of his regular duties as a law enforcement officer, Deputy Bickhart has had occasion to smell both burnt
(continued...)

Deputy Bickhart took Defendant to the back seat of his patrol car.[14]  Tr. from 5/5/10 at 20, 52, 53, 70.

Mr. Jones testified that upon reflection, he thinks Defendant's behavior "was drug related."[15]  Tr. From 4/23/10 at 94.  Deputy Bickhart testified he thought at the time of the incident Defendant "was definitely on something, because his demeanor was like very violent."  Tr. from 5/5/10 at 21, 92.

Following Defendant's arrest, Deputy Bickhart interviewed Mr. Johnston and Mr. Jones.  Tr. from 5/5/10 at 78.  Additionally, both men provided Affidavits concerning their involvement in the incident.  See Gov. Exh. Nos. 5, 6.  Although Deputy Bickhart observed the men trying to pull Defendant out of the Vehicle, Deputy Bickhart testified he was never told by the men, nor by Defendant, that the men had tried to pull Defendant out of the Vehicle.  Tr. from 5/5/10 at 55-56.  However, Deputy Bickhart's offense report indicates, "N. Jones stated he grabbed [Defendant] by the arm to pull him out of the vehicle."  Def's. Exh. No. 7 at 7.  In addition, the offense report states, "D. Johnston stated he ran around to the passenger side of the vehicle to assist N. Jones with getting [Defendant] out of the vehicle." Id.  Deputy Bickhart inferred at the evidentiary hearing that these facts were taken from the witnesses' Affidavits, not from their interviews.  Tr. from 5/5/10 at 56-57.  Deputy Bickhart

---

[13](...continued)
and raw marijuana in "numerous cases[.]" Tr. from 5/5/10 at 109.  Deputy Bickhart testified he was unable to recall whether the smell was of burnt or raw marijuana.  Tr. from 5/5/10 at 108.

[14]      Mr. Johnston thought Defendant was placed in the back of another patrol car, Tr. from 4/23/10 at 71, but Deputy Bickhart testified he put Defendant in his own patrol car.  Tr. from 5/5/10 at 20, 52, 53, 70.

[15]      Mr. Jones based this opinion on his experience as a correctional officer in the "medical section" of a prison.  Tr. from 4/23/10 at 95-96.

testified he never considered whether Defendant could have been acting in self defense when he was resisting the men; instead, after conducting an investigation which included interviewing witnesses, he determined Defendant had committed a battery.[16]  Tr. from 5/5/10 at 62, 85.  Furthermore, Deputy Bickhart interviewed Defendant while Defendant was sitting in the back seat of the patrol car, but he does not recall being told anything about Defendant having been pulled out of the Vehicle by the men.  Tr. from 5/5/10 at 63, 65.  During the interview, Deputy Bickhart confirmed Defendant was "definitely . . . on something" because, in addition to Defendant's previous demeanor which had since changed to a calmer state, "[h]is eyes were real bloodshot, real red; his pupils were big."  Tr. from 5/5/10 at 94-95, 97.  Although Deputy Bickhart was convinced Defendant was "on something," Defendant was apparently coherent enough to engage in the interview and to deny any knowledge of guns or narcotics in the Vehicle.  See Def.'s Exh. No. 7 at 8.  After denying knowledge of guns and narcotics in the Vehicle, Defendant refused to answer any other questions.  See id.

In the offense report, Deputy Bickhart identified the following offenses for which Defendant was arrested: (1) possession of a weapon during the commission of a second degree felony, in violation of Section 775.087(1)(b) of the Florida Statutes; (2) possession of a weapon or ammunition by a convicted felon, in violation of Section 790.23(1)(a) of the Florida Statutes; (3) possession of stolen property, in violation of Section 812.014(1)(b) of the Florida Statutes; (4) resisting an officer without violence, in violation of Section 843.02 of the Florida Statutes; (5) possession of marijuana with intent to sell, manufacture, or

---

[16]     Despite Deputy Bickhart reaching this conclusion, his offense report does not list battery as an offense for which Defendant  was arrested.  See Def's. Exh. No. 7 at 2-3.  However, the report does indicate Defendant "struck [a] victim[.]"  Id. at 4.

deliver the controlled substance, in violation of Section 893.13(1)(a)(2) of the Florida Statutes; (6) possession of a controlled substance without a valid prescription, in violation of Section 893.13(6)(c) of the Florida Statutes; and (7) trafficking in cocaine, in violation of Section 893.135(1)(b)(1) of the Florida Statutes.  Def's. Exh. No. 7 at 2-3.

### B. Post-Arrest Events Leading to Search of Vehicle

Deputy Bickhart testified that even though he smelled what he believed to be marijuana, he did not immediately search the Vehicle.  Tr. from 5/5/10 at 70-71.  Instead, while Deputy Bickhart was interviewing Defendant, Deputy Bickhart asked Defendant for consent to search the Vehicle.  Tr. from 5/5/10 at 22, 86, 88-90.  According to Deputy Bickhart, Defendant verbally consented to a search of the Vehicle "several times" while he was sitting in the back of the patrol car.  Tr. from 5/5/10 at 22, 89, 91; see also Def.'s Exh. No. 7 at 8.  After the interview, Defendant was placed "on the front of [Deputy Bickhart's] patrol car[.]"  Tr. from 5/5/10 at 87, 88, 91.  Then, other deputies looked in the Vehicle from the outside but did not enter the Vehicle.[17]

In addition to asking Defendant for consent to search, Deputy Bickhart called for a K-9 unit within a "[c]ouple minutes after the incident took place."  Tr. from 5/5/10 at 21, 74, 86.  Within "roughly four to five minutes" after Defendant was handcuffed, K-9 Corporal Greg Mullenix arrived on the scene.  Tr. from 5/5/10 at 21-22.  Corporal Mullenix arrived so quickly because he was in the area of the hotel when he heard the initial dispatch go out, so he decided to go to the hotel without having been dispatched himself.  Tr. from 5/5/10 at 134.

---

[17]     There was conflicting testimony about whether the Vehicle was searched by the deputies or whether deputies just looked inside the Vehicle while they stood outside it.  A more detailed discussion of the testimony and the undersigned's factual finding with respect to this matter follow on p.13-14 n.19, infra.

When Corporal Mullenix was actually called to the scene, he was already "about halfway there." Tr. from 5/5/10 at 134.  Corporal Mullenix had his K-9, Kobe, with him.[18]  Tr. from 5/5/10 at 120, 124.

According to Corporal Mullenix, he arrived at the scene sometime between 8:07 a.m. and 8:08 a.m.  Tr. from 5/5/10 at 124.  When he arrived, Corporal Mullenix observed the Vehicle's engine area smoking.  Tr. from 5/5/10 at 125, 151.  He also saw Deputy Bickhart and Deputy McGuire, as well as members of the fire department.  Tr. from 5/5/10 at 125.  By the time Corporal Mullenix arrived, Defendant had been relocated from the front of Deputy Bickhart's patrol car to the outside back trunk area of Deputy Bickhart's patrol car.  Tr. from 5/5/10 at 147.[19]

---

[18]    Kobe has been working with Corporal Mullenix since January 2003.  Tr. from 5/5/10 at 122.  Kobe has been trained by the Southern Hills Kennels, by various police K-9 training institutions, by the National Narcotic Detector Dog Association, by the Northeast Florida Criminal Justice and Training and Education Center, and by the North Florida American Police Work Dog Association.  Tr. from 5/5/10 at 122-23; see also Gov's. Exh. Nos. 3, 4.  At the time Kobe was deployed in the instant matter, he had last been certified on April 29, 2009, which was within the one-year time frame required by the St. Johns County Sheriff's Office.  Tr. from 5/5/10 at 123.  Kobe was later recertified on April 7, 2010.  Tr. from 5/5/10 at 123.  Kobe is trained to detect marijuana, cocaine, crack cocaine, methamphetamine, heroin, and ecstasy.  Tr. from 5/5/10 at 123.  Of the 2,097 positive alerts Kobe had given as of March 2, 2010 (the date in question), there were "[l]ess than ten times" in which drugs were not located.  Tr. from 5/5/10 at 124, 132-33.  Each time, Corporal Mullenix was able to confirm through some other source that drugs had recently been in the search area in some way or another.  Tr. from 5/5/10 at 124, 132-33.

[19]    Deputy Bickhart first testified on cross-examination that before Corporal Mullenix arrived with his K-9, "the other deputies searched the [V]ehicle."  Tr. from 5/5/10 at 87.  Later, when questioned by the Court, Deputy Bickhart testified that before Corporal Mullenix arrived, "[he and other deputies] started looking around the car."  Tr. from 5/5/10 at 89.  On re-direct examination, Deputy Bickhart clarified that a "plain view" search had taken place before Corporal Mullenix arrived.  Tr. from 5/5/10 at 104-05.  According to Deputy Bickhart, a plain view search occurred because deputies "just look[ed] into the [V]ehicle, [they did] not get[] into the [V]ehicle."  Tr. from 5/5/10 at 105.  Corporal Mullenix testified he understood at the time that no physical search had been performed prior to his arrival, and he did not witness anyone go inside the Vehicle until after his K-9 alerted.  Tr. from 5/5/10 at 131, 146.  The DEA 6 Report of Investigation prepared by Drug Enforcement Administration Special Agent Timothy Reichenbach (who arrived at the scene at some point) indicates "a cursory search" was conducted, during which Deputy Bickhart "observed a clear plastic baggie containing two suspected MDMA (ecstacy) pills in the front seat center console (plain view)."  Def's. Exh. No. 9 at 2.  Although unclear, Deputy Bickhart seems to have agreed on cross-examination that he saw two MDMA tablets on top of the center console sometime during the struggle with Defendant, Tr. from 5/5/10 at 96-97, but he also stated
(continued...)

Corporal Mullenix spoke with Deputy Bickhart.  Tr. from 5/5/10 at 126, 135.  Deputy Bickhart requested Corporal Mullenix to deploy Kobe for an exterior sniff of the Vehicle.  Tr. from 5/5/10 at 126, 135.  According to Corporal Mullenix, Deputy Bickhart also told him "he smelled a faint odor of marijuana," Tr. from 5/5/10 at 135-36, 149-50, and possibly told him about having seen a firearm.  Tr. from 5/5/10 at 149.

Corporal Mullenix noticed the driver's side door was slightly ajar, so he closed it prior to deploying Kobe.  Tr. from 5/5/10 at 146.  Kobe was deployed at 8:10 a.m. and finished sniffing by 8:12 a.m.  Tr. from 5/5/10 at 126, 128.  Kobe began sniffing at the right headlight area and walked counterclockwise around the Vehicle.  Tr. from 5/5/10 at 126.  After "one pass," Kobe alerted on the "driver's side passenger door seam" by sitting and staring at the seam.  Tr. from 5/5/10 at 126-27.  Corporal Mullenix cannot remember if the engine was still running when Kobe was sniffing.  Tr. from 5/5/10 at 151.

Corporal Mullenix notified Deputy Bickhart that he had received a positive alert.  Tr. from 5/5/10 at 127.   After the positive alert, Defendant was presented with a Permission to Search form to sign.  Tr. from 5/5/10 at 87-88, 89-90, 91, 105, 128.  Deputy Bickhart testified the officers decided to present Defendant with the form even though Defendant had orally consented to the search and even though the K-9 had alerted to the presence of narcotic odor.  Tr. from 5/5/10 at 89-90.  This was done at the instruction of Deputy Bickhart's Sergeant, who had "rolled up on the scene" and requested that Defendant be given the form

---

[19](...continued)
on cross-examination that he had not located any narcotics inside the Vehicle by the time Defendant was physically detained. Tr. from 5/5/10 at 93. Considering the testimony and evidence on this subject as a whole, and having observed the demeanor of Deputy Bickhart while he testified, the undersigned finds as a factual matter that the deputies did not actually conduct a search of the Vehicle prior to Corporal Mullenix and the K-9 arriving. Rather, they stood outside the Vehicle and looked inside it.

to sign "[j]ust as an extra document."  Tr. from 5/5/10 at 89-90.  Despite Defendant having previously given Deputy Bickhart verbal consent to search the Vehicle, Defendant refused to sign the Permission to Search form.  Tr. from 5/5/10 at 87-88, 89-90, 91, 105, 128; <u>see also</u> Def's. Exh. No. 6 ("Permission to Search" form indicating Defendant "gave consent to search then refused to sign").  Corporal Mullenix testified he believes the form was presented to Defendant at about 8:35 a.m.  Tr. from 5/5/10 at 128.  Corporal Mullenix noted the date and time, as well as the location, on the Permission to Search form that Defendant refused to sign.  Tr. from 5/5/10 at 137; <u>see also</u> Def.'s Exh. No. 6.

The Vehicle was searched after 8:35 a.m.  Tr. from 5/5/10 at 129.  Deputies found "two orange tablets in the center console area" which later field tested positive for MDMA; "a gray digital scale in the center console area"; "a long rifle. . . between the . . . front passenger seat and the center console area"; and "a black bag on the right passenger floorboard" containing "a clear plastic bag, vacuum sealed, with a green leafy substance, a paper bag that contained several plastic bags [containing] a whitish hard substance," a "plastic bag" with "a powdery white substance" and several "plastic baggies with nothing inside of them."  Tr. from 5/5/10 at 129-30, 138.  Deputy Bickhart's offense report indicates the white substances field tested positive for cocaine and the green leafy substance field-tested positive for marijuana.  Def's. Exh. No. 7 at 8.  Deputies also found burnt marijuana on the driver's side floorboard and burnt or raw marijuana on the back passenger's floorboard.  Tr. from 5/5/10 at 110, 130.  According to Deputy Bickhart's offense report, he further found a "semi-auto handgun . . . partially underneath the driver's seat."  Def's. Exh. No. 7 at 8.

### III.  Summary of Argument

Defendant seeks to suppress "any and all evidence seized and/or obtained from the Defendant, as a result of the search of his [V]ehicle[.]"  Motion at 1.  As grounds for suppressing the evidence seized from the Vehicle, Defendant originally contended the search "was not incident to a lawful arrest," "was not based on the discovery of any obvious contraband in plain view," and "no exigent circumstances, or other exception to the warrant requirement, existed to justify this warrantless search."  Id. at 3.

After the evidentiary hearing, Defendant's Supplement was filed, in which Defendant argues he was "illegally arrested, without probable cause."  Defendant's Supplement at 1. Defendant contends he had an affirmative defense to the battery, which Deputy Bickhart ignored.  Id. at 2-4.  Defendant also takes issue with the testimony that he "gave verbal consent to the search," but "a dog search was commenced, anyway."  Id. at 5.  In arguing he did not consent to the Vehicle being searched, Defendant relies on the police radio dispatch recording of Corporal Mullenix, submitted as Defendant's Exhibit No. 8, "wherein he told the police evidence technician that the Defendant had refused a search, and that was why he was called in to do a K-9 sniff."[20]  Defendant's Supplement at 5 (citing Tr. from 5/5/10 at 140-43).  In contending he refused to consent to a search of the Vehicle, Defendant also relies on Defendant's Exhibit No. 6, the Permission to Search form that he refused to sign. Defendant's Supplement at 6.

---

[20]      A review of Defendant's Exhibit No. 8 and the Transcript from 5/5/10 indicates Corporal Mullinex was actually speaking to a dispatcher on the recording.  See Def.'s Exh. No. 8; Tr. from 5/5/10 at 143. When asked about his statements to the dispatcher, Corporal Mullinex explained that he "was going off of the permission to search [form] after the fact[.]"  Tr. from 5/5/10 at 144.  "That is - - that was just a brief synopsis of what [he] was giving to the dispatcher.  It had no bearing on what took place basically with [his] report and how it took place there."  Tr. from 5/5/10 at 144.

As to the length and scope of his detention, Defendant claims he was "detained longer than necessary, without the required investigation that would have dispelled the suspicion forming the basis for his detention." Id. Defendant speculates the detention and K-9 sniff occurred because he refused to consent to the search of his Vehicle. Id. (referring to United States v. Boyce, 351 F.3d 1102 (11th Cir. 2003)).

Defendant asks the Court to find incredible Deputy Bickhart's testimony that he smelled the faint odor of marijuana after the struggle to get Defendant out of the Vehicle. Defendant's Supplement at 6-7. According to Defendant, the deputy's testimony in this regard "was merely an afterthought, brought up at the suppression hearing, in case all other justifications for the [V]ehicle search failed." Id. at 8.

The Government responds that initially Deputy Bickhart not only had "an articulable suspicion of criminal activity" by all three individuals involved in the incident, including Defendant, but also had "probable cause. . . because a possible crime was taking place in his presence and because there was a car engulfed in smoke that required investigation." Response at 9 (citations omitted). According to the Government, Deputy Bickhart developed additional support to detain and ultimately arrest Defendant because (1) he determined Defendant was the aggressor; (2) neither Mr. Jones, nor Mr. Johnston attacked Deputy Bickhart but Defendant did; (3) Defendant appeared to Deputy Bickhart to be under the influence of alcohol or narcotics; and (4) Defendant broke away, made his way back to the Vehicle, and attempted to reach underneath the driver's seat for something. Id. at 10-12. These facts, says the Government, established probable cause to arrest Defendant for the offenses of battery and disorderly intoxication. Id. at 18.

The Government further contends the length and scope of the detention while waiting for the K-9 to arrive were reasonable, noting that Corporal Mullenix arrived at the scene "roughly four to five minutes after Deputy Bickhart detained the [D]efendant[.]" Id. at 14. According to the Government, the ultimate "search of the interior of the [V]ehicle was lawfully based on a positive K-9 alert." Id. at 15. Alternatively, the Government contends the search could have been "based on the 'faint odor' of marijuana emanating from the front driver's seat area detected by Deputy Bickhart." Id. at 16.

### IV.  Analysis

#### A.  Arrest of Defendant

Defendant argues he was "illegally arrested, without probable cause." Defendant's Supplement at 1. According to Defendant, "the only basis on which Deputy Bickhart testified he determined the Defendant was the aggressor, is not supported by the facts." Id. at 2. Furthermore, Defendant contends he was acting in self defense and "a minimal further investigation. . . would have exonerated [him]." Id. at 3-4. The undersigned first discusses probable cause for Defendant's arrest, followed by an analysis of the alleged affirmative defense which Defendant contends defeated probable cause.

#### 1.  Defendant's Arrest Was Supported by Probable Cause

The undersigned concludes that when Defendant was taken into custody, probable cause existed to arrest Defendant for at least two offenses: (1) battery and (2) resisting an officer without violence.  "Probable cause to arrest exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime." United States v. Gonzalez, 969

F.2d 999, 1002 (11th Cir. 1992) (citing <u>Beck v. Ohio</u>, 379 U.S. 89, 91 (1964)).  "Probable cause determinations traditionally have been guided by reviewing the totality of the circumstances."  <u>Gonzalez</u>, 969 F.2d at 1002 (citing <u>Illinois v. Gates</u>, 462 U.S. 213, 233 (1983)).

As to battery, Section 784.03(1)(a) of the Florida Statutes indicates the offense "occurs when a person: 1.  Actually and intentionally touches or strikes another person against the will of the other; or 2. Intentionally causes bodily harm to another person."  Fla. Stat. § 784.03(1)(a).  The facts known to Deputy Bickhart at the time of the incident are as follows.  Deputy Bickhart drove up to the scene and observed three men fighting or in some sort of a fray.  Tr. from 5/5/10 at 18, 33-34.  Two of the men were attempting to pull the third man out of the Vehicle, which appeared to Deputy Bickhart to be on fire.  Tr. from 5/5/10 at 12, 29, 30, 31, 36. Despite the good Samaritans' attempt to assist Defendant, Defendant was combative.  Tr. from 4/23/10 at 26; Tr. from 5/5/10 at 18, 38, 53, 67-68.  Deputy Bickhart was able to determine, based upon what he observed, that a battery was occurring and Defendant was the aggressor.  Tr. from 5/5/10 at 20, 39, 54.  Given the events that occurred in Deputy Bickhart's presence, there was "a reasonable belief that [Defendant] had committed or was committing" the crime of battery.[21]  See <u>Gonzalez</u>, 969 F.2d at 1002.

---

[21]     As noted <u>supra</u> p. 11 n.16, the offense report authored by Deputy Bickhart does not list battery as an offense for which Defendant was arrested.  It is unknown why battery was not listed.  However, Deputy Bickhart unequivocally testified at the evidentiary hearing that when he arrived at the scene, he observed what he subjectively believed at the time to be "a battery occurring in [his] presence, a misdemeanor."  Tr. from 5/5/10 at 18, 38, 53, 67-68, 85-86.  An officer's subjective belief regarding probable cause to arrest is of no moment to a court's later determination of whether probable cause existed.  <u>See</u> <u>Devenpeck v. Alford</u>, 543 U.S. 146, 153 (2004) (stating "'evenhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend on the state of mind of the officer'") (internal alteration omitted) (quoting <u>Horton v. California</u>, 496 U.S. 128, 138 (1990)); <u>Rankin v. Evans</u>, 133 F.3d 1425, 1433 (11th Cir. 1998) (holding "[n]o subjective belief requirement exists under either [Florida] state or federal law").  The undersigned (continued...)

As to the offense of resisting an officer without violence, such a violation occurs when a person "resist[s], obstruct[s], or oppose[s] any officer . . . without offering or doing violence to the person of the officer[.]" Fla. Stat. § 843.02.  Deputy Bickhart announced several times upon arriving at the scene that he was a law enforcement officer, Tr. from 5/5/10 at 15, 39, 41, but Defendant continued to be combative.  Tr. from 4/23/10 at 26.  At that point, Deputy Bickhart did what any trained officer would do: he tried to break up the suspects engaged in a confrontation and to subdue the aggressor.  See Pedro-Domingo v. U.S. Attorney Gen., 367 Fed. App'x 112, 115 (11th Cir. Feb. 25, 2010) (unpublished) (observing "[o]fficers' duties include detaining suspects, breaking up fights, and other duties that routinely involve physical intervention in confrontational circumstances . . .").  When Deputy Bickhart entered the fray to assist the two men in subduing Defendant, Defendant began attacking him by throwing elbows and shoving the deputy.  Tr. from 4/23/10 at 75, 122; Tr. from 5/5/10 at 15, 101.  In addition, Defendant broke away from Deputy Bickhart and the two men and made his way back to the Vehicle, despite Deputy Bickhart attempting to subdue him.  Tr. from 5/5/10 at 43-44.  Based upon what occurred in Deputy Bickhart's presence, there was "a reasonable belief that [Defendant] had committed or was committing" the crime of resisting an officer, at the very least, without violence.[22]  See Gonzalez, 969 F.2d at 1002.

---

[21](...continued)
finds that the evidence objectively demonstrates probable cause for this offense did indeed exist, and that Deputy Bickhart observed Defendant's conduct establishing such probable cause.

[22]        As noted supra at p. 11, the offense report does list resisting an officer without violence as an offense for which Defendant was arrested.

### 2. Probable Cause Was Not Defeated by the Alleged Affirmative Defense

Defendant argues he "had a complete affirmative defense to the battery": self defense. Defendant's Supplement at 3-4. In advancing this argument at the evidentiary hearing, Defendant relied on the Florida Statutes which make it justifiable to use non-deadly force when an individual unlawfully and forcibly enters another individual's vehicle. According to Defendant, Deputy Bickhart should have considered the affirmative defense in determining whether probable cause existed.

It is not entirely clear whether a law enforcement officer is required to assess the possibility of an affirmative defense prior to making an arrest for that arrest to be considered lawful by a reviewing court considering a motion to suppress. See United States v. Craig, No. 09-10647, 2010 WL 2465015, at *2 (5th Cir. June 17, 2010) (unpublished) (reviewing the district court's denial of a criminal defendant's motion to suppress and declining to decide "whether an arresting officer making a probable cause determination must consider facts establishing an affirmative defense," but assuming an officer must consider such facts and determining no such affirmative defense existed); United States v. Marin, 138 Fed. App'x 945, 946 (9th Cir. July 8, 2005) (unpublished) (reviewing the district court's denial of a criminal defendant's motion to suppress and "assuming *arguendo* that [the affirmative defense of] entrapment could vitiate a probable cause determination," but finding the defendant "was not entrapped as a matter of law") (internal citation omitted).

In the context of an alleged affirmative defense known to an arresting officer when the officer is later sued under 42 U.S.C. § 1983 for a constitutional violation, the United States Court of Appeals for the Eleventh Circuit has stated that "in determining whether

probable cause to arrest exists, an officer must consider all facts and circumstances within that officer's knowledge, including facts and circumstances <u>conclusively establishing</u> an affirmative defense." <u>Williams v. Sirmons</u>, 307 Fed. App'x 354, 359 (11th Cir. Jan. 13, 2009) (unpublished) (emphasis added) (collecting cases).  However, law enforcement officers are not required to conduct "quasi-trials as a necessary predicate to the warrantless arrest of perpetrators in every situation wherein the subject asserts a purported legal excuse for his actions." <u>Painter v. Robertson</u>, 185 F.3d 557, 571 n.21 (6th Cir. 1999).  Only "where a reasonable police officer would conclusively know that an investigative target's behavior is protected by a legally cognizable affirmative defense" does an officer lack probable cause to arrest. <u>Id.</u> (internal citation omitted).  "In all other cases, the merits of an alleged affirmative defense should be assessed by prosecutors and judges, not policemen." <u>Id.</u> (internal citation omitted).

Like the <u>Craig</u> and <u>Marin</u> courts, the undersigned assumes (without deciding) that in the context of a motion to suppress by a criminal defendant based on a lack of probable cause to arrest, a reviewing court should evaluate whether law enforcement considered facts conclusively establishing an affirmative defense. <u>See Craig</u>, 2010 WL 2465015, at *2; <u>Marin</u>, 138 Fed. App'x at 946; <u>cf. United States v. Sledge</u>, No. 4:05CR3072, 2005 WL 2347247, at *17 (D. Neb. Sept. 26, 2005) (unpublished) (in deciding a motion to suppress, applying the "conclusively established" standard to determine probable cause for an arrest did not exist).  With this assumption in mind, it is determined that an affirmative defense was not conclusively established in this case.

The relevant portions of the Florida Statutes on self defense state as follows:

A person is justified in using force, except deadly force, against another when and to the extent that the person reasonably believes that such conduct is necessary to defend himself or another against the other's imminent use of unlawful force.

Fla. Stat. § 776.012.

(1) A person is presumed to have held a reasonable fear of imminent peril of death or great bodily harm to himself . . . when using defensive force that is intended or likely to cause death or great bodily harm to another if:
(a) The person against whom the defensive force was used was in the process of unlawfully and forcefully entering, or had unlawfully and forcibly entered, . . . [an] occupied vehicle, or if that person had removed or was attempting to remove another against that person's will from the . . . occupied vehicle; and
(b) The person who uses defensive force knew or had reason to believe that an unlawful and forcible entry or unlawful and forcible act was occurring or had occurred.

Fla. Stat. § 776.013(1).

A presumption of reasonable fear of imminent peril of great bodily harm requires that the person using force in self defense "knew or had reason to believe that an unlawful and forcible entry or unlawful and forcible act was occurring or had occurred."  Fla. Stat. § 776.013(1).  Here, Deputy Bickhart saw the struggle when he arrived at the scene.  Deputy Bickhart determined in a short amount of time that Defendant was the aggressor and he needed to be detained or arrested.  At the time Defendant was taken into custody, it had not been conclusively established that the men were unlawfully and forcibly entering the Vehicle, or that Defendant knew or had reason to believe this was the case.  Given the circumstances as they existed at the moment Defendant was taken into custody, and as they were known to Deputy Bickhart at that time, there was no basis upon which to "conclusively establish" that the affirmative defense existed.  See Williams, 307 Fed. App'x

at 359; <u>Painter</u>, 185 F.3d at 571 n.21.  Therefore, the alleged affirmative defense did not

defeat the requisite probable cause for the warrantless arrest.  <u>See</u> <u>Williams</u>, 307 Fed. App'x

at 359; <u>Painter</u>, 185 F.3d at 571 n.21.[23]

Focusing on the battery, Defendant points to the lack of "a further investigation" to

"consider whether or not the Defendant was acting in self-defense."   Defendant's

Supplement at 2.  According to Defendant, "a minimal further investigation . . . would have

exonerated [him]."  <u>Id.</u> at 4.  Defendant relies on <u>Kuehl v. Burtis</u>, 173 F.3d 646 (8th Cir.

1999) to support his argument that Deputy Bickhart "ignored evidence tending to negate the

possibility that the [D]efendant had committed a crime," and therefore the deputy arrested

Defendant without requisite probable cause.  Defendant's Supplement at 3.  In that case,

Kuehl (the plaintiff/respondent) sued a police officer under 42 U.S.C. § 1983 for arresting

her without probable cause.  <u>Kuehl</u>, 173 F.3d at 648.  The district court denied the defendant

police officer's motion for summary judgment on the basis of qualified immunity, and the

---

[23]    An extension of Defendant's argument regarding the affirmative defense to battery might be that Defendant would have the same affirmative defense to resisting an officer without violence.  However, the presumption of a reasonable fear of imminent peril of death or great bodily harm does not apply if:

> (d) The person against whom the defensive force is used is a law enforcement officer, as defined in s. 943.10(14), who enters or attempts to enter a . . . vehicle in the performance of his or her official duties and the officer identified himself or herself in accordance with any applicable law or the person using force knew or reasonably should have known that the person entering or attempting to enter was a law enforcement officer.

Fla. Stat. § 776.013(2)(d).  The law is clear that such a presumption of reasonable fear of imminent peril of death or great bodily harm does not apply if a person resists a law enforcement officer attempting to enter a vehicle, so long as the officer identifies himself as a law enforcement officer, or the person knew or reasonably should have known the officer was a law enforcement officer.  Here, both were met: Deputy Bickhart announced "several times [he was] a law enforcement officer."  Tr. from 5/5/10 at 15, 29, 41.  In addition, any reasonable person in Defendant's position would have been able to tell Deputy Bickhart was a law enforcement officer.  Therefore, the alleged affirmative defense Defendant relies on for battery would not defeat the probable cause that Deputy Bickhart developed which supported the arrest for resisting an officer without violence.

defendant police officer appealed to the United States Court of Appeals for the Eighth Circuit.  Id.

    A detailed discussion of the facts and issues in Kuehl is instructive.  Kuehl owned and managed a boutique.  Id.  McBeth, an African-American male, entered the boutique while Kuehl was working.  Id.  McBeth "believed that Kuehl was following him and watching him too closely because of his race."  Id.  "McBeth approached Kuehl, pushed her roughly, stated that he was not a thief," and called her names.  Id.  After asking McBeth to leave the store to no avail, Kuehl reached for the telephone to call the police, but she was prevented from doing so by McBeth.  Id.  Kuehl tried to push McBeth out of the way and "inadvertently struck McBeth's face with her hand."  Id.  McBeth then "struck Kuehl with a closed fist; Kuehl flew some eight feet through the air, lost her glasses and earrings, and suffered marked facial bruising."  Id.  An employee of Kuehl stepped in front of McBeth in an attempt to prevent him from striking Kuehl again, and McBeth threw the employee against a wall.  Id.  Another employee contacted the mall security.  Id.  Security guards arrived and restrained McBeth while the police were en route.  Id.  Upon arriving at the scene, the defendant police officer interviewed several witnesses, who all "stated that Kuehl struck McBeth on the face[.]"  Id.  In addition, the defendant police officer "observed some 'very slight bruising' on McBeth's face."  Id.  An employee who originally said Kuehl slapped McBeth attempted to retract her statement, but the defendant police officer "ignored the retraction and omitted it from his police report."  Id.  Kuehl explained to the defendant police officer "that McBeth had hit her, that she had feared for her safety, and that she pushed him out of the way so that she could reach a telephone and call the police."  Id.  "Despite the pronounced bruising on

Kuehl's face, [the defendant police officer] refused to speak further with her, and he omitted Kuehl's version of events from his police report." Id. Furthermore, "the only witness who saw the entire altercation between Kuehl and McBeth" tried to explain "what had transpired" between the two individuals but the defendant police officer refused to interview the witness. Id. The defendant police officer arrested Kuehl for simple assault. Id. at 649.

The Eight Circuit observed that the defendant police officer "ignored the circumstances that would have explained why Kuehl struck McBeth or that would have shown that McBeth's injuries occurred inadvertently when Kuehl tried to push him away from her." Id. at 648-49. In analyzing whether probable cause existed under the "totality of the circumstances," the court expressed two "standards" to be considered. Id. at 650-52. First, "evidence that tends to negate the possibility that a suspect has committed a crime is relevant to whether the officer has probable cause." Id. at 650. Second, "law enforcement officers have a duty to conduct a reasonably thorough investigation prior to arresting a suspect, at least in the absence of exigent circumstances and so long as law enforcement would not be unduly hampered if the agents wait to obtain more facts before seeking to arrest." Id. (internal alterations and quotation omitted). Finding the defendant police officer was not entitled to qualified immunity, the court indicated "plainly exculpatory evidence . . . negated the intent required for simple assault," but such evidence was ignored. Id. at 651. Namely, the defendant police officer ignored Kuehl's version of events, the "sizeable bruise over her left eye," the fact that Kuehl told McBeth to leave the store, the fact that McBeth hit Kuehl, and the employee's attempt to retract her statement that Kuehl had slapped McBeth. Id. In addition, the defendant police officer refused to interview the only witness

that saw the entire altercation.  Id.  Finally, the court observed that "more thorough interview[s] would not have unduly hampered the process of law enforcement . . . , and the record presents no indication that exigent circumstances precluded a more thorough investigation[.]"  Id.  The decision of the district court to deny the defendant police officer's motion for summary judgment based on qualified immunity was affirmed.  Id.

Notwithstanding Kuehl's factual distinctions from the instant case, an application of the two "standards" articulated in Kuehl results in a finding that probable cause for the arrest existed and was not defeated.  First, Deputy Bickhart did not ignore evidence that tended to negate the possibility that Defendant committed a crime.  See Kuehl, 173 F.3d at 650. Though Deputy Bickhart did not consider whether Defendant was acting in self defense when he was resisting the men, Tr. from 5/5/10 at 62, 85, such a defense to the battery was not obvious in this situation.   In fact, despite Defendant agreeing to speak with Deputy Bickhart, he evidently did not mention or take issue with being pulled out of the Vehicle by the men.[24]  Tr. from 5/5/10 at 63, 65.  Nor was there any testimony presented that would tend to indicate Defendant himself even believed he was acting in self defense.[25]  Compare Kuehl, 173 F.3d at 648-49 (the defendant police officer essentially rushed to judgment while refusing to recognize facts which would have conclusively exonerated Kuehl–despite Kuehl

_____

[24]     As previously noted, even though Defendant appeared to be under the influence of something, he was at least apparently coherent enough to initially engage in an interview, to deny knowledge of guns or illegal drugs in the Vehicle, and to make the decision to cease the interview.

[25]     The undersigned notes that Mr. Johnston communicated to Defendant upon approaching the Vehicle that the Vehicle was on fire and Defendant needed to get out of the Vehicle.  Tr. from 4/23/10 at 23, 24, 53, 86.  Quite tellingly, Defendant had no reaction after Mr. Johnston said the Vehicle was on fire.  Tr. from 4/23/10 at 23, 24, 53, 86.  When the driver's door was opened and the men attempted to get Defendant out of the Vehicle, he did not say anything to them; instead, he started fighting them.  Tr. from 4/23/10 at 24, 25, 57, 92.

insisting that she only pushed McBeth out of the way in an attempt to call police, the defendant police officer ignored her version of events).

Second, the record establishes that initially there were exigent circumstances preventing Deputy Bickhart from conducting an investigation prior to taking Defendant into custody because (1) the Vehicle appeared to be on fire; (2) Defendant was violent and combative; (3) Defendant was insisting on getting back into the Vehicle; (4) Defendant got back into the Vehicle and was reaching for an unknown object; and (5) Deputy Bickhart saw what he believed to be the butt of a rifle inside the Vehicle.  Tr. from 4/23/10 at 26; Tr. from 5/5/10 at 12, 16, 19, 29, 30, 36, 43-44, 45, 69-70, 102, 103.  Once the exigency subsided, Deputy Bickhart proceeded to investigate the matter.  Tr. from 5/5/10 at 62, 65.  Deputy Bickhart interviewed witnesses, including Defendant.  Tr. from 5/5/10 at 63, 65, 78; compare Kuehl, 173 F.3d at 648 (the defendant police officer ignored crucial facts and refused to interview the only witness to the entire altercation).  Even in the aftermath, nothing was brought to Deputy Bickhart's attention that would have led him to consider whether Defendant was acting in self defense.  It is evident that a "reasonably thorough investigation" was conducted after Defendant's arrest.  See Kuehl, 173 F.3d at 650.  Nevertheless, the investigation did not conclusively establish the alleged defense on which Defendant now relies.  See Williams, 307 Fed. App'x at 359; Painter, 185 F.3d at 571 n.21.

Having found Defendant's alleged affirmative defense to the battery did not defeat probable cause, the undersigned finds Defendant was lawfully arrested for that offense. See Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001) (holding "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal

offense in his presence, he may, without violating the Fourth Amendment, arrest the offender"); Fla. Stat. § 901.15(1) (authorizing a warrantless arrest when a "person has committed a felony or misdemeanor . . . in the presence of the officer").  Additionally and independently, as previously found, Defendant was lawfully arrested for resisting an officer without violence.  See Atwater, 532 U.S. at 354; Fla. Stat. § 901.15(1).[26]

### B. Search of the Vehicle

Defendant argues the search of the Vehicle was not permissible under any exception to the warrant requirement.  Motion at 3.  Generally, the Fourth Amendment requires law enforcement officers to obtain a warrant before conducting a search.  Maryland v. Dyson, 527 U.S. 465, 466 (1999).  However, there is an exception to the warrant requirement for

---

[26]     Assuming arguendo that probable cause did not exist to arrest Defendant prior to the search, the undersigned finds alternatively that, based on the events Deputy Bickhart witnessed which have been described herein, there was reasonable suspicion that criminal activity was occurring or was about to occur.  See Terry v. Ohio, 392 U.S. 1, 30 (1968) (holding a law enforcement officer may stop an individual and briefly detain the individual for investigatory purposes if the officer has a reasonable, articulable suspicion criminal activity may be afoot); see also United States v. Powell, 222 F.3d 913, 917 (11th Cir. 2000) (stating that "[u]nder Terry, law enforcement officers may detain a person briefly for an investigative stop if they have a reasonable, articulable suspicion based on objective facts that the person has engaged in, or is about to engage in, criminal activity").  Based on reasonable suspicion, Deputy Bickhart lawfully detained Defendant to perform an investigation.  See Terry, 391 U.S. at 30; Powell, 222 F.3d at 917.  Because Defendant was lawfully detained, his reliance on United States v. Boyce, 351 F.3d 1102 (11th Cir. 2003) is misplaced.  Compare Boyce, 351 F.3d at 1110 (observing that "the decision to detain [the defendant] and to call the drug dog unit was based on [the defendant's] refusal to consent to a search of his vehicle" and finding because the officer had not actually developed reasonable, articulable suspicion of criminal activity, the detention of the defendant while waiting for a drug dog to arrive was not reasonable under the Fourth Amendment) (emphasis supplied).

Furthermore, the evidence presented at the evidentiary hearing established that Deputy Bickhart called for a K-9 unit within a "[c]ouple minutes after the incident took place," and that Corporal Mullenix arrived within "roughly four to five minutes" after Defendant was handcuffed.  Tr. from 5/5/10 at 21-22.  Deputy Bickhart would not have been able to perform an investigation to confirm or dispel his suspicion of criminal activity in such a short period of time, especially given that the Vehicle appeared to be on fire; Defendant appeared to be under the influence of something which was affecting his behavior; and several witnesses needed to be interviewed.  Accordingly, the length and scope of the detention prior to the arrival of the K-9 unit were reasonable.  Cf. United States v. Monzon-Gomez, 244 Fed. App'x 954, 959-60 (11th Cir. 2007) (unpublished) (length of traffic stop was reasonable when deputies held a motorist for thirty minutes based on reasonable suspicion that the defendant had engaged in criminal activity).

automobiles because their mobility makes obtaining a search warrant impracticable.  See

United States v. Ross, 456 U.S. 798, 806-07 (1982); see also Dyson, 527 U.S. at 466-67;

Carroll v. United States, 267 U.S. 132, 153-54 (1925).  "Under the automobile exception,

agents may conduct a warrantless search of a vehicle if (1) the vehicle is readily mobile (i.e.,

operational); and (2) agents have probable cause to believe the vehicle contains contraband

or evidence of a crime."  United States v. Tamari, 454 F.3d 1259, 1261 (11th Cir. 2006); see

also United States v. Lindsey, 482 F.3d 1285 (11th Cir. 2007).  When the automobile

exception applies, police officers may conduct a search of a vehicle that is as thorough as

could be authorized in a warrant particularly describing the place to be searched.  Ross, 456

U.S. at 800, 823-24 (internal quotation and citation omitted).

"The requirement of mobility is satisfied merely if 'the automobile is operational.'"

Lindsey, 482 F.3d at 1293 (quoting United States v. Watts, 329 F.3d 1282, 1286 (11th Cir.

2003)).  Here, the Vehicle's engine was running during the entire incident, although the

Vehicle appeared to be on fire.  It was later determined that the Vehicle was not on fire;

rather, it was overheating.  Because the Vehicle's engine was on and the Vehicle was not

actually on fire, the Vehicle was operational.  The facts that the Vehicle was backed up to

a retention pond and Deputy Bickhart may have blocked Defendant's Vehicle in by the way

he parked his patrol car upon arriving at the scene are immaterial to the determination that

the Vehicle was operational.  See United States v. Parrado, 911 F.2d 1567, 1571 (11th Cir.

1990) ("'the justification to conduct . . . a warrantless search does not vanish once the car

has been immobilized; nor does it depend upon a reviewing court's assessment of the

likelihood in each particular case that the car would have been driven away. . .'") (quoting

Michigan v. Thomas, 458 U.S. 259, 261 (1982)); United States v. Rivera, 825 F.2d 152, 158 (7th Cir. 1987) (recognizing the mobility requirement can be satisfied "even if the car is parked and stationary when agents find it").   Therefore, the first requirement of the automobile exception is satisfied.

As to the second requirement of the automobile exception, the positive alert by K-9 Kobe gave rise to probable cause to search the Vehicle.  With respect to dog sniffs and alerts, courts have recognized that an alert by a well-trained canine for the presence of narcotics can create probable cause and have evidentiary value.  See, e.g., United States v. Place, 463 U.S. 696, 707 (1983) (discussing the intrusiveness of a dog sniff in the context of Fourth Amendment protections); United States v. Banks, 3 F.3d 399, 402 (11th Cir. 1993) (citing prior Eleventh Circuit precedent and stating, "Our circuit has recognized that probable cause arises when a drug-trained canine alerts to drugs") (internal citations omitted); United States v. Toepfer, Nos. 04-60090, 06-12718, 2008 WL 2673878, at *2 (11th Cir. July 9, 2008) (per curiam) (unpublished) ("probable cause is established when drug-trained canine alerts to drugs") (citing Banks, 3 F.3d at 402).  In the context of determining a motion to suppress narcotics found in a vehicle, this Court recently recognized that the Eleventh Circuit has found "training alone" can be sufficient to prove a narcotics detection K-9's reliability.  United States v. Anderson, No. 3:08-cr-256-J-32HTS, 2008 WL 5235111, at *2 (M.D. Fla. Dec. 15, 2008) (unpublished) (citing Banks, 3 F.3d at 402) (other internal citations omitted).

The Government established Kobe's training through the testimony of Corporal Mullenix and by admitting into evidence the pair's training certificates.  Based on the

testimony and the evidence presented on the issue, the undersigned finds K-9 Kobe was

reliable.  Probable cause to believe the Vehicle contained contraband was established by

K-9 Kobe's positive alert signal.  See United States v. Watts, 329 F.3d 1282, 1286 (11th Cir.

2003) (citing Banks, 3 F.3d at 402) (stating the Eleventh Circuit "has recognized that

probable cause arises when a drug-trained canine alerts to drugs").  Because the positive

alert established probable cause to believe the Vehicle contained contraband, the search

of the Vehicle was proper under the automobile exception to the warrant requirement.[27]  See

United States v. Rollins, 699 F.2d 530, 534 (11th Cir. 1983) (finding a warrantless search

---

[27]        Given the finding that probable cause existed to search the Vehicle due to the K-9's alert to the presence of narcotic odor, it is not necessary to resolve the parties' remaining contentions with respect to the validity of the search. However, for the sake of completeness, the following observations are made with respect to the remaining contentions.

        As to Defendant's allegation that he refused to consent to a search of the Vehicle, see Def.'s Supplement at 5-6, the Government has conceded that Defendant's alleged verbal consent was revoked prior to the search occurring. See Response at 16. Therefore, whether Defendant verbally consented is immaterial.

        As to the Government's argument that Deputy Bickhart's alleged "faint" smell of marijuana gave rise to probable cause to search the Vehicle, Response at 16, Deputy Bickhart's testimony with respect to smelling marijuana was equivocal. In fact, the first time he testified about smelling marijuana, in his own words, he only "possibly" smelled it. Tr. from 5/5/10 at 20. Also, Deputy Bickhart did not include the alleged smell of marijuana in the narrative of his offense report. Tr. from 5/5/10 at 27, 73; Def.'s Exh. No. 7 at 7-8. Further, Deputy Bickhart could not tell whether the smell was of burnt marijuana or raw marijuana. Tr. from 5/5/10 at 108. Finally, assuming Deputy Bickhart did smell marijuana, he described the smell as "faint." Tr. from 5/5/10 at 68.

        Near the end of its Response, the Government passingly suggests without a detailed discussion that the search could have been conducted under the search incident to arrest exception to the warrant requirement. See Response at 18 (stating "because prior to the search Deputy Bickhart had both an articulable suspicion of criminal activity and probable cause sufficient to detain the defendant for battery and for disorderly intoxication[], a search of the car for evidence relating to those offenses would have been lawful on this ground alone") (internal citations omitted). With respect to battery, the undersigned is unsure what "evidence relating to" that offense would have been found in the Vehicle, and the Government has not suggested any. With respect to disorderly intoxication, the relevant facts were not sufficiently developed at the evidentiary hearing to enable the undersigned to determine whether (1) there was probable cause to believe such offense had occurred, (see Fla. Stat. § 856.011 (identifying as disorderly intoxication being intoxicated and causing a public disturbance)) or (2) if so, under the somewhat recent dictates of Arizona v. Gant, 129 S. Ct. 1710, 1714 (2009) and its progeny, whether "it [was] reasonable to believe that evidence of the offense of arrest might be found in the vehicle."

of an airplane "based on a legal arrest supported by probable cause" was permissible under, inter alia, the "automobile" exception to the warrant requirement) (internal citations omitted).

## V.  Conclusion

The arrest of Defendant was supported by probable cause.  Furthermore, the probable cause was not defeated by a conclusively established affirmative defense.  Finally, the search of the Vehicle was supported by probable cause because a reliable drug K-9 alerted to the presence of narcotics in the Vehicle.

After due consideration, it is

**RECOMMENDED**:

That Defendant's Motion to Suppress (Doc. No. 42) be **DENIED.**

**RESPECTFULLY RECOMMENDED** at Jacksonville, Florida on September 15, 2010.

_James R. Klindt_
**JAMES R. KLINDT**
United States Magistrate Judge

kaw
Copies to:

Honorable Marcia Morales Howard
United States District Judge

Assistant U. S. Attorney (Pilgrim)
Mark S. Barnett, Esquire

-33-